IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN L. PERDUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:04CV799-M |
| | ) | [WO] |
| C. HAGER & SONS HINGE MFG., | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER ON MOTION**

The defendants ["Hager"]  filed a Motion for Summary Judgment (Doc. # 53) of plaintiff's ["Perdue"] claim of religious discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (2004), and state law torts, including "defamation," "negligence and wantonness," and "negligent hiring, training, supervision, and retention" (Doc. # 25).  Perdue responded, and the parties submitted legal briefs and evidentiary materials supporting their positions (Docs. # 54-61, 63, 69).  After thoroughly reviewing the parties' submissions, the court finds that the motion should be granted with respect to Perdue's discrimination claim, and Perdue's state law claims should be dismissed without prejudice.

**I.   FACTS**

After 23 years of virtually untarnished employment with Hager, Perdue, while working and using one of the company's telephones, inadvertently dialed the wrong number

when attempting to contact the local power company to report a problem (Perdue Dep., 80-81; 212).[1]  A recorded voice that Perdue recognized answered the call, and Perdue left the following message:

> Well, hello there, Bert Loeb.  I am glad to see that you got into another line of business, but - - and I'm surprised it's you, but since I have you listening - - and you're probably wondering who this is - - and I know of your background, your heritage, that you're Jewish.  Jesus loves you.  Jesus is the Messiah.  He has come, and he is coming again.  I hope you come to the saving knowledge of Jesus.

(Perdue Dep., p. 118).[2]

Bert Loeb ["Loeb"] owns a concrete design company called ConCreations, Inc., which is based in Montgomery, Alabama (Loeb Aff., ¶ 2).  The number Perdue dialed belonged to Loeb's company, and after listening to the message and determining, using his caller identification system, that it had originated with Hager, Loeb recorded the message on tape and sent a copy along with a letter to Hager's human resources manager, David Ward ["Ward"] (Ward Aff., ¶ 2).[3]  The letter, which was dated 14 June 2004, stated as follows in its entirety:

> Please find enclosed a cassette tape with a recording which may interest you.  This message was received on my business phone on Friday, May 28, 2004, at 1:48 p.m.  This time is during my

---

[1]Hager disputes Perdue's claim that the call was accidental, but this dispute is immaterial.

[2]The message was played at Perdue's deposition and thereafter transcribed.  Hager also submitted a digital audio copy (Doc. # 58).

[3]The letter also indicates that a copy was sent to Rusty Hager, the company's chief executive officer at the time (Loeb Aff., Ex. 2).

office hours, and it is my assumption that it is also within your business hours.

Mr. Ward, is prophesizing [sic][4] indicative of your company's policy? The demeanor and anonymity of this phone call greatly concern me, as I'm sure would [sic] concern a large number of contractors, developers, suppliers, and architects in this area that are also Jewish.

It is my understanding that the voice on this recording belongs to Mr. Sonny Beck. I respect Mr. Beck's religious beliefs but do not understand the necessity of his actions, especially emanating from your company. The phone number associated with this message was (334) 288-8873, which when I called, belongs [sic] to Hager Hinge in Hope Hull. I do not know Mr. Beck, [sic] and cannot help but wonder what instigated this call, and if I was the only person subjected to this behavior. [sic]

It is my feeling that if you are not aware of what is being practiced at your company, that it may benefit you to know. As a business owner, I would certainly appreciate someone letting me know if one of my employees' actions were such as these.

Thank you for your time in reading this correspondence and would [sic] appreciate your letting me know what measures, if any, are taken.

(Loeb Aff., Ex. 2).

After receiving the letter and listening to the message, Ward conferred with Blake Earnest ["Earnest"], Hager's "Group Vice President Domestic [sic] Supply Chain Operations and Corporate Human Resources" (Ward Aff., ¶¶ 2, 4; Earnest Aff., ¶ 2). Earnest identified

---

[4]It is not clear whether he meant "prophesying," which means, *inter alia*, "to declare or predict (something) by or as by the influence of divine guidance," WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY UNABRIDGED 1443 (2d ed. 1980), or "proselytizing," which means "to make a convert of." *Id.* at 1445.

the voice–the same voice that had been recorded on Hager's electronic telephone greeting– as Perdue's. (Earnest Aff., ¶ 7; Perdue Dep., 48-49). They agreed that Ward should meet with Perdue and his supervisors, Michael Perry ["Perry"] and Bob Dansavage ["Dansavage"] (Earnest Aff. ¶ 8; Ward Aff. ¶ 4).

At the meeting on 25 June 2004, Perdue confirmed that the voice on the tape was his and that he had left the message (Doc. # 63-1, p. 4; Ward Aff., ¶ 4; Perry Aff., ¶ 4; Dansavage Aff., ¶ 4).[5] Ward suspended Perdue and conferred again with Earnest (Earnest Aff., ¶ 9; Ward Aff., ¶ 6). In a certified letter dated 29 June 2004, Hager terminated Perdue's employment. In relevant part, the letter stated,

> We recently were contacted by Mr. Burt [sic] Loeb of Concreations. He was concerned about an anonymous voice mail message that was left for him on Friday, May 28, 2004 at 1:48 p.m. His caller ID showed that the call came from (334) 288-8873, the Hager Hinge Distribution facility where you work. He sent us a cassette tape with a recording of the voice mail message. We have reviewed the message carefully, and we have determined that the voice on the message is yours. Your conduct in leaving this message from a Hager Hinge facility telephone was completely unacceptable. The message sounded ominous and offensive, and the fact that it was left anonymously only supports that conclusion. Your references to Mr. Loeb's religious faith and personal background in this manner obviously caused concern for Mr. Loeb. Reasonable people would find these statements insulting, offensive and harassing.

---

[5]Additional details of the meeting are the subject of some dispute but ultimately immaterial. For example, Ward, Perry and Dansavage all describe Perdue as having seemed disinterested during the meeting (Ward Aff., ¶ 4; Perry Aff.; ¶ 4, Dansavage Aff.; ¶ 4). Moreover, they all suggest that Perdue offered no explanation despite having an opportunity to do so. *Id.* Perdue concedes nothing regarding his demeanor and alleges that he was given no opportunity to explain his actions, though he testified that he had nothing to say because he "was totally flabbergasted" (Doc. # 25, ¶¶ 23, 25; Perdue Dep., 151).

4

The fact that you made these statements from a Hager Hinge facility telephone, during working hours, put the company at substantial risk that its reputation would be harmed and that its customers and prospective customers would be justifiably offended.  We are terminating your employment effective immediately, June 29, 2004, because of the anonymous, insulting and harassing telephone message you left for Mr. Loeb from a Hager Hinge facility telephone.

(Pl's. Ex. 5, Doc. # 63-11).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Green v. Pittsburgh Plate and Glass Co*., 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  "A judge's guide is the same standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id*. at 259.  "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

On a motion for summary judgment, the court is to construe the evidence and factual

inferences arising therefrom in the light most favorable to the nonmoving party.[6] *Adickes*

*v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d

739, 742 (11th Cir. 1996).  Notwithstanding this advantage, a nonmoving plaintiff bears the

burden of coming forth with sufficient evidence on each element that must be proved.[7]

*Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990); *see Celotex*, 477

U.S. at 322-23.  When faced with a properly supported motion for summary judgment, a

---

[6]  The Supreme Court explained that:

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against
> a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which
> that party will bear the burden of proof at trial. In such a situation,
> there can be "no genuine issue as to any material fact," since a
> complete failure of proof concerning an essential element of the
> nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citations omitted).

[7]  In a Title VII claim based on circumstantial evidence, "if on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, . . . [the court must] grant summary judgment [for the defendant]." *Earley*, 907 F.2d at 1080 (citations omitted).  In *Earley*, the Court of Appeals further emphasized:

> "The mere existence of a scintilla of evidence in support of the
> plaintiff's position will be insufficient;  there must be evidence on
> which the jury could reasonably find for the plaintiff." *Anderson*,
> 477 U.S. at 252.
>                              ***
> If the evidence is merely colorable, or is not significantly probative,
> summary judgment may be granted." *Anderson*, 477 U.S. at 249-50
> (citations omitted) (emphasis added); *accord  Hudson v. Southern
> Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988).

*Earley*, 907 F.2d at 1080-81.

6

plaintiff must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324.  Although the evidence need not be in a form necessary for admission at trial, *id.*, unsupported, self-serving allegations are insufficient to oppose a motion for summary judgment. *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).

### III.   DISCUSSION

#### A.   *Title VII*

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1) (2004).  A discriminatory act may be demonstrated upon showing that "religion . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."  *Id.* at § 2000e-2(m).  "All forms and aspects of religion, however eccentric, are protected except those that cannot be, in practice and with honest effort, reconciled with a business like operation." *Cooper v. Gen. Dynamics, Convair Aerospace Div., Ft. Worth Operation,* et al., 533 F.2d 163, 168-69 (5th Cir. 1976) (addressing a claim that the employer failed to accommodate the plaintiff's religious belief that supporting a labor union violated a religious tenet).[8]

---

[8]In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

To survive summary judgment, a plaintiff alleging employment discrimination under Title VII must present evidence, either direct or circumstantial, sufficient to allow a reasonable fact finder to conclude that the defendant intentionally and unlawfully discriminated against the plaintiff, i.e., in a religious discrimination case, that the employment decision at issue was made "on account of [the plaintiff's] religious *beliefs*." *Young v. Southwestern Sav. & Loan*, 509 F.2d 140, 143 (5th Cir. 1975) (emphasis added).

Perdue, who alleges that he was subjected to disparate treatment because of his religion when Hager terminated his employment,[9] contends that his claim is supported by both direct and circumstantial evidence (Doc. # 63-1). Interestingly, as direct evidence of discrimination, Perdue relies upon his interpretation of Hager's stated reason for his termination: as expressed by Ward in the termination letter, the company viewed his message, which constituted an expression of his religious faith, as "insulting, harassing and offensive" (Doc. # 63-1, p. 5-9). Perdue construes Hager's view as

---

[9]Perdue offers no response to Hager's contention that he has failed to present evidence that would support a claim that Hager unreasonably failed or refused to accommodate a religious belief or practice (Doc. # 63-1). As discussed more fully *infra*, Perdue lacks direct evidence of discrimination; therefore, any claim that Hager failed to accommodate a religious belief would require as an initial matter evidence that Perdue "(1) . . . had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement." *Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d 589, 592 n.5 (11th Cir. 1994). No evidence before the court suggests that at the time Perdue left the anonymous message for Loeb he believed that his religion required him to do so or that he had informed Hager of this fact. *See Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167-68 (2d Cir. 2001) (holding that the plaintiffs failed to demonstrate a *prima facie* case when they lacked evidence that their employer "was on notice of their need to evangelize to clients" and, regardless, the employer was not required to accommodate such a need). Therefore, Perdue cannot satisfy his initial burden.

> merely that Plaintiff's expression of his religious faith was insulting and harassing because Plaintiff's faith was conveyed to someone who may be of a different faith and may disagree with the tenets of Plaintiff's faith. Thus, even when viewing the issue as Defendants attempt to frame it, no one can avoid the inescapable conclusion that religion and/or the expression of religious views and faith by the Plaintiff was a motivating and significant factor in Defendant's decision to terminate Plaintiff's employment.

(Doc. # 63-1, p. 9).[10]

Alternatively, Perdue contends that he has provided sufficient circumstantial evidence to permit an inference of religious discrimination (Doc. # 63-1, pp. 10-19). Adding an interesting twist, Perdue recasts Hager's stated reason for firing him as a pretext for, as opposed to direct evidence of, discrimination and claims this, too, is supported by evidence before the court. *Id.*

Hager responds by challenging the legal rationale underlying Perdue's claim of direct evidence (Doc. # 69, 4-13). In addition, Hager contends that Perdue has failed as a matter of law to present a *prima facie* case of discrimination and, alternatively, to offer sufficient evidence that Hager's stated reason is pretext. *Id.*

## 1.   Direct Evidence

> [The Eleventh Circuit Court of Appeals] defines direct evidence of discrimination as "evidence which reflects 'a discriminatory

---

[10]Perdue's articulation circumvents important facts, such as when, where and how his expression of faith occurred, i.e., during business hours, while at work, and anonymously, using a company phone. *See also infra* part III.A.2.b.

or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" ***Damon*** **[*v. Fleming Supermarket's of Am.*]**, 196 F.3d [1354,] 1358 [(11th Cir. 1999)] (quoting ***Carter v. Three Springs Residential Treatment***, 132 F.3d 635, 641 (11th Cir. 1998)).   Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." ***Burrell v. Bd. of Trs. of Ga. Military Coll.***, 125 F.3d 1390, 1393 (11th Cir. 1997).   As . . . precedent illustrates, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. ***Rojas v. Florida***, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting ***Schoenfeld*** **[*v. Babbitt*]**, 168 F.3d [1257,] 1266 [(11th Cir. 1999)] (citations and quotations omitted); *see* ***Carter v. City of Miami***, 870 F.2d 578, 582 (11th Cir. 1989).   If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *See* ***Burrell***, 125 F.3d at 1393.

***Wilson v. B/E Aerospace, Inc.***, 376 F.3d 1079, 1086 (11th Cir. 2004).

In the context of a religious discrimination claim, the "most obvious and compelling example" of direct evidence would "be a remark to the effect that . . . 'I'm firing you because you're . . . a Christian.'" ***Tillery v. ATSI, Inc.***, 242 F. Supp. 2d 1051, 1059 (N.D. Ala. 2003) (quoting ***Venters v. City of Delphi***, 123 F.3d 956, 972-73 (7th Cir. 1997)).

Perdue's argument misconstrues the law and defies logic, as evidenced by this excerpt from his memorandum:

If deciding to terminate a person because 'he is too old,' see ***Earley*** **[*v. Champion Int'l Corp.***, 907 F.2d [1077,] 1081-82 [(11th Cir. 1990)]**, is direct evidence of discrimination, the Defendant's decision to terminate Plaintiff because his expression of his religious views were allegedly too insulting and harassing is likewise direct evidence of discrimination"

(Doc. # 63-1, p. 9).

10

Contrary to Perdue's assertion, a company's termination of an employee for making an anonymous, inappropriate comment to a third-party business owner is not direct evidence of discrimination, notwithstanding the employer's asserted belief that one of the offensive aspects of the employee's actions is the comment's religious references.   *See **Helland v. South Bend Cmty. Sch.***, 93 F.3d 327, 330 (7th Cir. 1996) (finding, without discussion, that a plaintiff substitute teacher whose employment was terminated for, *inter alia*, proselytizing in class did not thereby present direct evidence of discrimination); *see also **Bodett v. CoxCom, Inc.***, 366 F.3d 736 (9th Cir. 2004) (affirming summary judgement against a plaintiff who claimed she was terminated for her religious views of homosexuality).[11]

Because an inferential step is required to journey from Hager's reason to the ultimate point Perdue must prove, i.e., that the decision to terminate him was borne of religious *animus*, Perdue has failed to present direct evidence of discrimination.[12]

---

[11]***Bodett*** is factually similar to the case before the court.  The plaintiff, who had worked for the defendant for 18 years without having received any discipline, was an Evangelical Christian who had made comments disapproving of homosexuality to a known homosexual subordinate.  366 F.3d at 740-42.  Although the subordinate did not utilize the company's employee complaint system, human resources personnel eventually became aware of the comments, and the plaintiff was terminated for violating the employer's harassment policy.  *Id.*

[12]The cases on which Perdue relies are distinguishable.  *See **Blalock v. Metal Trades, Inc.**,* 775 F.2d 703, 708 (6th Cir. 1985) (addressing evidence that the plaintiff's termination was due to a change in his "religious views"); *see also **Taylor v. Runyon**,* 175 F.3d 861, 867-68 (11th Cir. 1999) (holding that a statement to a female job applicant that she did not receive the job because a male job applicant had a family to support constituted direct evidence of discrimination); ***Caban-Wheeler v. Elsea**,* 904 F.2d 1549, 1555 (11th Cir. 1990) (holding that the statement to the plaintiff that the program for which she worked "needed a black director" constituted direct evidence of discrimination); ***Buckley v. Hosp. Corp. of Am.**,* 758 F.2d 1525, 1530 (11th Cir. 1985) (holding that a decision maker's comments regarding the "longevity" of the employees, the need for "new blood", his desire to recruit younger employees, and the plaintiff's "advanced age" constituted direct evidence of discrimination); ***Lee v. Russell County Bd. of Educ.**,* 684 F.2d 769, 772 (11th Cir.

### 2.    Circumstantial Evidence

With no direct evidence of discrimination, Perdue's Title VII claim must be analyzed according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To survive summary judgment, he must first present a *prima facie* case, which generally means he must demonstrate that he was a qualified member of a protected class and was treated differently than similarly situated persons outside his protected class.  *Wilson*, 376 F.3d at 1087.  Nevertheless, "[t]he methods of presenting a *prima facie* case are not fixed; they are flexible and depend to a large degree upon the employment situation."  *Id.*

Assuming he is able to demonstrate a *prima facie* case, the burden shifts to Hager to "*articulate* a legitimate, nondiscriminatory reason for its" allegedly discriminatory actions. *Id.* (emphasis added).  If Hager succeeds, the burden shifts back to Perdue

> to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination. **[*Tex. Dep't of Comty. Affairs v.*] *Burdine***, 450 U.S. [248,] 255-56 [(1981)].
>
> If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  ***Chapman* [*v. AI Transp.*]**, 229 F.3d [1012,] 1030 [(11th Cir. 2000)].  Quarreling with that reason is not sufficient. *See id.*  The evidence may include, however, the same evidence offered initially to establish the prima facie case. ***Combs* [*v. Plantation Patterns*]**, 206 F.3d [1519,] 1528 [(11th

---

1982) (holding that testimony that decision maker asserted a need for a "greater 'white presence'" and engaged in a plan to "build cases" against "black teachers more than anyone else" and to "stop white flight" constituted direct evidence of discrimination).

Cir. 1997)].

> Despite the shifting of the burden of production between the
> plaintiff and the defendant under the ***McDonnell Douglas***
> framework, "[t]he ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated against the
> plaintiff remains at all times with the plaintiff." ***Burdine***, 450
> U.S. at 253.

***Wilson***, 376 F.3d at 1087-88.

### a.      Prima Facie Case

Perdue has failed to present evidence that similarly situated persons outside his

protected class were treated differently.  Hager contends that this is dispositive, but the court

disagrees.

According to Hager's own brief,

> To establish a *prima facie* case using circumstantial evidence,
> Perdue must show that: "(1) he is a member of a protected class;
> (2) he [was qualified for the job from which he was discharged];
> (3) he experienced an adverse employment action; and (4)
> similarly situated individuals outside of his protected class were
> treated more favorably, *or that other circumstances surrounding*
> *the adverse employment action give rise to an inference of*
> *discrimination*." ***Lubetsky v. Allied Card Syss.***, 296 F.3d 1301,
> 1305 (11th Cir. 2002).

(Doc. # 54, p. 5) (emphasis added).

Perdue, on the other hand, advances a less stringent approach. Quoting from the same

case, Perdue nonetheless contends that "where intentional religious discrimination under

Title VII is alleged, a prima facie case is established if the plaintiff demonstrates the

challenged employment decision was made by someone who was aware of the plaintiff's religion" (Doc. # 63-1, p. 10).  ***Lubetsky***, 296 F.3d at 1305.

Although Perdue accurately quoted the opinion, and the meaning he assigns to the case is slightly defensible in light of the language chosen by the Court of Appeals, in context, the ***Lubetsky*** opinion stands for the proposition that a plaintiff seeking to demonstrate a *prima facie* case of religious discrimination must present evidence that, *inter alia*, the decision maker knew of the plaintiff's religion.

It did not, however, eliminate the long-standing requirement that the plaintiff's evidence must permit an inference of discrimination.[13]  *See **Tex. Dep't. of Comty. Affairs v.***

---

[13]Other passages from ***Lubetsky*** support this view.  For example, after determining that the decision maker did not know of the plaintiff's religion, the court concluded that, "viewing the facts in the light most favorable to Appellant, no reasonable fact-finder could conclude that [the defendant] knew of [the plaintiff's] religion, *much less* that [the defendant's] decision to direct Gracia to rescind [the plaintiff's] job offer *was motivated by his knowledge* of [the plaintiff's] religion."  296 F.3d at 1306-07 (emphasis added).  Finally, in summarizing its holding, the court stated, "It is necessary for a plaintiff attempting to establish a *prima facie* case of intentional religious discrimination under Title VII to demonstrate the challenged employment decision was made by someone who had knowledge of the plaintiff's religion."  *Id.* at 1307.  The language used by the court clearly is inclusive, not exclusive, as Perdue suggests.

Also, the cases to which the ***Lubetsky*** court cited in support of the statement Perdue quotes required more than mere knowledge.  *See **Beasley v. Health Care Svc. Corp.***, 940 F.2d 1085, 1088 (7th Cir. 1991) (requiring, in addition to knowledge, evidence that "the religious practices *were the basis of* the discharge"); *see also **Clay v. Holy Cross Hospital***, 253 F.3d 1000, 1005-07 (7th Cir. 2001) (setting forth the standard *prima facie* case requirements for a pregnancy discrimination claim and holding that  knowledge of the plaintiff's condition was necessary to satisfy the first prong); ***Geraci v. Moody-Tottrup, Int'l***, 82 F.3d 578, 580-82 (3d Cir. 1996) (holding, in another pregnancy discrimination case, "If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge *and present*, *as part of her prima facie case*, evidence from which a rational jury could infer that the employer knew that she was pregnant." (emphasis added)); ***Robinson v. Adams***, 847 F.2d 1315, 1316 (9th Cir. 1987) (holding, in a race discrimination case, that evidence that the decision maker knew the plaintiff was in a protected class was necessary to establish a *prima facie* case).

14

*Burdine*, 450 U.S. 248, 253 (1981) (describing the plaintiff's burden at the *prima facie* stage as requiring evidence that the employment decision was made "under circumstances which give rise to an inference of unlawful discrimination"); *Wilson*, 376 F.3d at 1092 (advancing a flexible approach to the *prima facie* case but requiring nonetheless "evidence of discrimination" at that stage); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002) ("In the absence of direct evidence, a plaintiff must create an inference of discrimination by establishing a prima facie case."); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999) (describing the effect of a prima facie case as establishing an inference of discrimination); *but see Walker v. Mortham*, 158 F.3d 1177, 1183-1185 (stating that the effect of the *prima facie* case is to "establish[] a *presumption*, and not an *inference*." (emphasis in original)).[14]

---

Finally, other courts in this circuit interpret *Lubetsky* as having clarified an otherwise intuitively discoverable truism. *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F. Supp. 2d 1329, 1344 (S.D. Fla. 2003) (noting that *Lubetsky* added the knowledge requirement to the *prima facie* case); *Tillery v. ATSI, Inc.*, 242 F. Supp. 2d 1051, 1061 n.44 (N.D. Ala. 2003) (describing *Lubetsky* as having "added the fifth element to the *prima facie* formulation"); *Rossi v. Troy Sate Univ.*, 330 F. Supp. 2d 1240, 1246-47 (M.D. Ala. 2002) (stating the standard four-prong *prima facie* case and later citing to *Lubetsky* for the knowledge requirement).

[14]Requiring evidence sufficient to *allow* for an inference of discrimination does not conflict with *Walker*'s conclusion regarding the *effect* of the *prima facie* case.  In other words, according to *Walker*, if the plaintiff presents a *prima facie* case, the court must presume an inference of discrimination.  158 F.3d 1183 n.10.  Thus, where the evidence at the *prima facie* stage *may* lead a fact finder to conclude that the employment decision was discriminatory, the presumption that arises eliminates any question unless and until the employer proffers a legitimate, nondiscriminatory reason.  *Cf. McDonnell Douglas Corp.*, 411 U.S. at 802-03 (establishing the burden-shifting framework). *Walker* later states that "a factfinder cannot infer intentional discrimination solely from the prima facie case." 158 at 1184 n.12.  The court cannot ignore, however, the obvious internal conflict in the very same footnote that is reflected two sentences later when the Court of Appeals states that "in some cases, the plaintiff, in order to prove intentional discrimination, will not need

15

Of course, neither did *Lubetsky* require a comparator as a *sine qua non* for a religious discrimination claim, notwithstanding Hager's suggestion to the contrary.  As quoted *supra*, *Lubetsky* itself recognized the catchall that applies when comparator evidence is lacking. An infinite array of statements, acts, or omissions can amount to direct or circumstantial evidence of discrimination due to a complainant's religion, even in the absence of a comparator.  This is certainly true for other forms of discrimination as well.  *See Wilson*, 376 F.3d at 1091-92 (11th Cir. 2004) (holding that the plaintiff's "failure to identify a comparator does not end the analysis of her termination claim" and quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), for the proposition that "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*" (emphasis in original)); *see also*, *e.g.*, *Bodett*, 366 F.3d at 743 (requiring as part of the *prima facie* case a showing that, *inter alia*, "similarly situated individuals outside [her] protected class were treated more favorably, *or* other circumstances surrounding the adverse employment action give rise to an inference of discrimination." (emphasis in original)); *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (describing the fourth prong of the *prima facie* case as requiring a showing that "the circumstances of the adverse employment decision give rise to an inference of discrimination").

In the instant case, Perdue has simply failed to demonstrate either direct evidence of

---

to produce any more evidence than what was *required* to establish the prima facie case."  *Id.* (emphasis added).

16

discrimination or the existence of a comparator.  Furthermore, the circumstances of Perdue's termination simply do not even give rise to an inference that he was the victim of unlawful discrimination.  *See Helland*, 93 F.3d at 330 (describing termination for proselytizing as a "legitimate nondiscriminatory reason[]").

As the court has previously stated, Hager's stated reason is an insufficient basis for concluding that Perdue was terminated because of his religious beliefs, and Perdue has failed to provide other evidence that the decision makers (undisputedly Ward and Earnest) were motivated by anything other than a desire to protect Hager and its business interests. Perdue's history with the company defies any conclusion that he was penalized merely for expressing his religious beliefs.  Throughout his long employment, Perdue did not hide his religious faith; he was notoriously religious.  For example, Perdue openly expressed his faith at work (including to Ward and Earnest (Perdue Dep., p. 70-71)), often ministering to his co-workers while on the job and during organized Bible studies (Perdue Dep., 29, 48).

Finally, his personal voice mail greeting on the company phone included a religious reference.  There is no evidence that Hager made any attempts to eliminate Perdue's practices or to penalize him for engaging in them.[15]  He was not asked to remove the message, and he

---

[15]Perdue alleges that his actions occasionally received a negative reaction, but his testimony is notably lacking in detail, and he could recount only a couple of incidents when a Hager manager, Gary Brewis, had referred to large religious paintings Perdue hung at work as "crap" (Perdue Dep., 39, 53).  Although he was never disciplined for hanging the paintings, at some point he was asked either to take them down or relocate his work space because the paintings were visible to other employees and visitors (Perdue Dep., 48-53; Earnest Dep., 48-59).

Brewis also used the word "crap" when instructing Perdue to remove a message he had recorded on the company telephone answering system that included the phrase "God Bless America"

was not otherwise disciplined (Perdue Dep. 47-48).

Therefore, Perdue has failed to establish a *prima facie* case. Nevertheless, in recognition that Perdue's burden at the *prima face* stage is slight, the court now focuses on the issue of pretext.

### b.    Pretext

Hager's asserted reason for terminating Perdue was that his message was offensive and inappropriate under the circumstances (Earnest Aff., ¶ 9). Hager contends that Perdue's behavior violated the company's "electronic communications policy and *general rules of conduct and decency expected of any employee representing Hager Hinge*." *Id.*

Perdue contends that the stated reason is pretext because:

1.    "Loeb's letter does not state that he was insulted, harassed or offended - only that he was concerned with having received the message";

2.    Ward and Earnest decided to terminate Perdue immediately after determining that it was he who left the message;

3.    Despite Ward's and Earnest's concern that Perdue may use the phone to make similar phone calls, he was nonetheless allowed continued access to the company phones until he was suspended approximately 10 days later;

---

(Perdue Dep., 49). He used similar language as well when telling Perdue to remove such non-religious phrases as "Happy Holidays" and "Seasons Greetings." *Id.*

Perdue also testified that Dansavage had made "snide remarks, dirty jokes" to other employees in his presence, but Perdue could not recall either the comments or the jokes and did not specify whether these comments and jokes were directed toward him or his religion (Perdue Dep. 66-67).

    4.      The electronic communications policy ["ECP"] pertains only to "harassment of any [Hager] employees";[16] and

    5.      Hager failed to follow its own policy of issuing a warning for violation of the ECP.[17]

---

[16]Perdue's version of the company's electronic policy is as follows:

> The Company's policy prohibiting harassment, in its entirety, applies to the use of the Company's Electronic Communications systems. No one may use electronic communications in a manner that may be construed by others as harassment or offensive based on race, color, religion, creed, age, sex, national origin or ancestry, marital status, veterans status or status as a qualified individual with a disability, in accordance with applicable laws.

(Doc. # 63-1, p. 16).

Assuming the accuracy of Perdue's quote as well as the truth of his assertion that the company's general "policy prohibiting harassment" applies only to conduct directed at employees, limiting application of the company's ECP to harassment already prohibited by a different harassment policy would make the ECP superfluous. Furthermore, the language of the ECP is unambiguously broad; had the company intended to limit its application to communications with Hager employees, the existence of another harassment policy so limited evidences the company's ability to have done so. Therefore, Perdue's contention is without merit.

[17]Again, Perdue's contention lacks merit. According to deposition testimony, Hager's discipline policy calls for warnings *except* when conduct is severe enough to merit immediate termination (Perdue Dep., 154-56). The handbook also lists examples of policies a first violation of which generally warrants a warning in lieu of termination. *Id.* Among those is the ECP. *Id.*

Earnest and Ward testified that Perdue's actions, the resulting consequences, and further potential repercussions, including a possible lawsuit by Loeb (Earnest Dep. 86-90), justified a termination without a warning (Earnest Dep., 108-178; Ward Dep., 192-98). Noting the warning policy and the fact that the company has never before disciplined anyone for violation of the ECP, Perdue contends that their

> explanation is so illogical that it borders on absurdity. If we assume Defendants contentions [sic] are true (i.e. that the Electronic Communications Policy would apply to persons outside the company; the voicemail was harassing), which they are not, anytime a person violated the Electronic Communication policy [sic] they [sic] would always be committing severe conduct.

19

(Doc. 63-1, 10-19).

The legal standard for proving pretext is difficult  to meet, as the Court of Appeals

painstakingly has made clear:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.  *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs*, 106 F.3d at 1541-43.   We have recognized previously and we reiterate today that:
>
>> [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.
>
> *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or

(Doc. # 63-1).

20

> for no reason at all, as long as its action is not for a discriminatory reason."); ***Abel v. Dubberly***, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000). We "do not . . . second-guess the business judgment of employers." ***Combs***, 106 F.3d at 1543; *accord* ***Alexander***, 207 F.3d at 1339, 1341; ***Damon v. Fleming Supermarkets of Fla., Inc.***, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.   We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).

***Chapman v. AI Transport***, 229 F.3d 1012, 1030 (11th Cir. 2000).

Perdue's view of the evidence in this case as well as the circumstances of his termination is skewed, to say the least, as is best illustrated perhaps by Perdue's insistence that he was fired simply for telling "someone Jesus loves him" (Perdue Dep., 72, 160, 178, 179, 189, 222, 236, 239 ).  Regardless, Perdue's first three assertions, accepted as true though not entirely supported by evidence, simply do not suggest that Hager terminated his employment for any reason other than that given.  As discussed *supra* in footnotes 16 and 17, his last two assertions are without merit.

Unfortunately, Perdue has hoist his claim upon a pedestal of seemingly deliberate misinterpretation.  He is either unable or unwilling to evaluate the circumstances  - as this court must do -  in the actual, and therefore proper, context.  That factual context can be schematically illustrated as follows.   The undisputed evidence establishes that Perdue

✓   while at work,

✓   during working hours,

✓   using a company phone,

21

✓     anonymously,

✓     and with no business purpose,

✓     left a recorded message,

✓     which affirmed or touted Perdue's religious faith ("Jesus is the Messiah"),[18]

✓     while denigrating the different religious faith ("I hope you come to the saving knowledge of Jesus")

✓     of a local businessman in the construction industry,

✓     who then permanently recorded the message

✓     and drafted a letter of complaint

✓     that threatened the company's reputation in that industry

✓     as a result of the message Perdue left.

Despite Perdue's and his counsel's efforts to convince the court otherwise, each of these factors contribute to a unique situation, and no one of them can be viewed in isolation. Eliminating or changing any one of them potentially affects the entire context of Perdue's actions and, perhaps, could result in a different analysis, conclusion and consequence by a reviewing employer.  In other words, based solely on Hager's reaction in this instance, these circumstances combine to establish an exemplary ECP violation that will result in termination without warning.  To borrow Perdue's phrase, presuming that these same circumstances would  necessarily replicate themselves with every violation of the ECP "is

---

[18]Hager's ECP specifically references acts pertaining to one of the triggering subjects (i.e. race, color, religion, creed, age, sex, national origin or ancestry, marital status, veterans status or status as a qualified individual with a disability).

so illogical that it borders on absurdity" (Doc. # 63-1, p. 17).

Therefore, pretext has not been demonstrated.[19]  *See **Bodett***, 366 F.3d at 745-46 (rejecting plaintiff's arguments that the conduct for which she was fired did not constitute harassment as defined in the company's policy and holding that the company's decision to terminate her, which was made before meeting with her, without the "usual" warning was not evidence of pretext)

Whether Hager *should* have fired him for leaving the message is not for this court to decide.  All that matters is that Perdue has not provided evidence suggesting that Hager discriminated against him when it chose to do so.


**B.    *Remaining Claims***

Having disposed of all claims over which the court has original jurisdiction and pursuant to 28 U.S.C. § 1367 (2004), the court declines to exercise supplemental jurisdiction over Perdue's state law claims.  The supplemental jurisdiction statute provides, in relevant part:

> (a) Except as provided in subsections (b) and (c) ..., in any civil action of which district courts shall have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the

---

[19]Again, the case on which Perdue relies is inapposite.  ***Copley v. Bax Global, Inc.***, 80 F. Supp. 2d 1342, 1351 (S.D. Fla. 2000) (holding that the plaintiff's pretext evidence was bolstered by "otherwise benign facts").

United States Constitution.

. . . . . . . . . .

(c) The district courts may decline to exercise supplemental
jurisdiction over a claim under subsection (a) if–

> (1) the claim raises a novel or complex issue of
> State law,

> (2) the claim substantially predominates over
> the claim or claims over which the district court
> has original jurisdiction,

> (3) the district court has dismissed all claims
> over which it has original jurisdiction, or

> (4) in exceptional circumstances, there are other
> compelling reasons for declining jurisdiction.

28 U.S.C.A. §1367.

Because the defendant is entitled to summary judgment regarding the "claims over

which the district court has original jurisdiction," namely the federal claim of religious

discrimination, the court may exercise its discretion, pursuant to subsection (c)(3) above, to

decline to exercise supplemental jurisdiction over Perdue's state law claims. *Palmer v.*

*Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1568 (11th Cir. 1994).

Therefore, Perdue's state law claims of defamation, negligence and wantonness, and

negligent hiring, training, supervision and retention should be dismissed without prejudice.

24

## IV.   CONCLUSION

For the reasons stated herein, it is ORDERED that:

1.      The Motion for Summary Judgment (Doc. # 53) be and is GRANTED with

respect to Perdue's religious discrimination claims;

2.      Perdue's federal claims be DISMISSED with prejudice; and

3.      Perdue's remaining claims be and are DISMISSED without prejudice.

The Clerk of the court is DIRECTED to terminate all motions in this case.

DONE this 1st day of November, 2005.


                                    /s/ Vanzetta Penn McPherson
                                    VANZETTA PENN MCPHERSON
                                    UNITED STATES MAGISTRATE JUDGE